FH PARTNERS, LLC, Appellant,

v.

COMPLETE HOME CONCEPTS, INC., et al., Respondents.

No. WD 74653.

Missouri Court of Appeals,
Western District.

Sept. 18, 2012.

---

1. The jury acquitted the defendant on six other counts—five counts of armed criminal action and one count of kidnapping.

Matthew L. Faul and Randall F. Scherck, Kansas City, MO, for appellant.

John R. Shank, Jr., Kansas City, MO, for respondents.

Before DIV III: VICTOR C. HOWARD, Presiding Judge, KAREN KING MITCHELL, Judge and CYNTHIA L. MARTIN, Judge.

CYNTHIA L. MARTIN, Judge.

This case involves a dispute over the right to collect two commercial loans issued by a bank which failed and became subject to the control of the Federal Deposit Insurance Corporation ("FDIC"). FH Partners, LLC ("FH Partners") claims it has the right to collect both loans. FH Partners appeals from the trial court's grant of summary judgment in favor of Complete Home Concepts, Inc. ("CHC"), the borrower on the loans, and James G. Goodwin, Sheryl A. Goodwin, Jeffrey W. Goodwin, Gail B. Goodwin, Ralph Haughenberry, Jennifer M. Haughenberry, JJJ Enterprises, LLC, and J–Jay Properties, LLC, ("Guarantors") the guarantors on the loans.[1]

We affirm in part, reverse in part, and remand for further proceedings consistent with this Opinion.

### Factual and Procedural History

The material facts are not in dispute.

### *The Columbian Bank Loans to CHC*

On August 1, 2007, Columbian Bank and Trust Company ("Columbian") loaned $925,000.00 ("Loan A") to CHC evidenced by a promissory note ("Note A") and a security agreement. Note A required equal payments of $19,148.90 on the first of each month beginning September 1, 2007, through August 1, 2012. On the same date, the Guarantors executed a commercial guaranty where they guaranteed payment of CHC's indebtedness to Columbian then existing or thereafter arising.

---

1. We hereinafter collectively refer to CHC and the Guarantors as the "Respondents."

On September 27, 2007, Columbian loaned $1,250,000.00 ("Loan B") to CHC evidenced by a promissory note ("Note B") and a security agreement. Note B required that all outstanding principal and interest be paid on or before September 27, 2008 (the "Maturity Date").

Notes A and B each included a cross-default provision which permitted CHC to be declared in default on either Note should CHC fail "to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between [Columbian] and [CHC]."

### The Columbian/Bank of Weatherford Participation Agreements

On February 22, 2008, Columbian and Bank of Weatherford ("Weatherford") entered into Non–Recourse Loan Participation Agreements ("Participation Agreements") which transferred to Weatherford a 94.5% participation interest in Loan A and a 64% participation interest in Loan B. Pursuant to the terms of the Participation Agreements, Columbian remained the "lead lender" with the responsibility to collect and account for payments made on both Loans.

### The FDIC's Appointment as Receiver

On August 22, 2008, Columbian failed. The FDIC was named as receiver and took control of Columbian. Pursuant to 12 U.S.C. section 1821(d)(2)(A)(i), the FDIC "succeed[ed] to 'all rights, titles, powers and privileges of [Columbian.]'" *Sunflower Bank, N.A. v. F.D.I.C.*, No. 09–4006–SAC, 2010 WL 3913597, at *7 (D.Kan. September 30, 2010), and thus assumed Columbian's position under Loan A and Loan B Participation Agreements.

### The FDIC/Weatherford Assignment of Loan A

On September 10, 2008, the FDIC and Weatherford entered into an Assignment Agreement where the FDIC conveyed all of its rights and interests in Loan A to Weatherford. As a result, Weatherford owned 100% of Loan A, and assumed the FDIC's rights to collect and enforce Loan A. Consistent with this fact, on or about September 20, 2008, CHC received correspondence from Weatherford indicating that: (1) Loan A had been assigned to Weatherford by the FDIC, and (2) future payments should be made to Weatherford. CHC began making its payments on Loan A to Weatherford.

### The FDIC/FH Partners Agreement Involving Loan A and Loan B

On December 16, 2008, the FDIC and FH Partners closed a transaction which purported to transfer Loan A and Loan B from the FDIC to FH Partners. The FDIC and FH Partners executed: (1) a Loan Sale Agreement, (2) a Bill of Sale, and (3) an Assignment and Assumption of Interests and Obligations (hereinafter, collectively, the FDIC/FH Loan Sale Documents). The FDIC/FH Loan Sale Documents reflected the FDIC's agreement to sell, and FH Partners' agreement to purchase, "all the right, title and interest" of the FDIC in Loans A and B. The FDIC/FH Loan Sale Documents did not address Weatherford's September 10, 2008 acquisition of a 100% ownership interest in Loan A, or the February 22, 2008 Participation Agreement which transferred a 64% participation interest in Loan B.

The FDIC/FH Loan Sale Documents provided that after closing, the FDIC could elect to grant FH Partners a limited power of attorney to prepare and execute transfer documents not delivered at closing. The term "transfer documents" was defined in the Loan Sale Agreement to include allonges, assignments, and any other documents "required under the laws of any jurisdiction within the United States to evidence the transfer" of Loan A and Loan B from the FDIC to FH Partners.

The definition of "transfer documents" expressly *excluded* the FDIC/FH Loan Sale Documents.

As anticipated by the Loan Sale Agreement, the FDIC granted FH Partners a limited power of attorney to prepare and sign transfer documents. An Assignment of Loan and Liens, and an Allonge, were prepared for both Loan A and Loan B (collectively "Transfer Documents"). The Transfer Documents were signed on the FDIC's behalf by Deborah Butler ("Butler"), a vice-president with FH Partners. The Transfer Documents bear a stated effective date of December 16, 2008, but do not indicate when they were actually signed. The FDIC's limited power of attorney authorized FH Partners to prepare and execute the Transfer Documents was effective from December 17, 2008, through December 31, 2009.

### The FDIC/Weatherford Agreement Involving Loan A and Loan B

On June 10, 2009, the FDIC and Weatherford entered into a Loan Exchange Agreement (the "FDIC/Weatherford Agreement"). The FDIC/Weatherford Agreement purported to exchange various loans so that the FDIC would own 100% of Loan A and Loan B and Weatherford would own 100% of other loans unrelated to this case. Weatherford executed a Termination of Participation Agreement for Loan A and Loan B terminating Weatherford's rights under the February 22, 2008 Participation Agreements.

The FDIC/Weatherford Agreement was executed on June 10, 2009. It provided for an effective date of November 7, 2008, a date which preceded the December 16, 2008 FDIC/FH Loan Sale Documents.

The FDIC/Weatherford Agreement did not explain the purpose for the retroactive effective date.

### FH Partners' Lawsuit to Collect Loan A and Loan B

On November 13, 2009, FH Partners made demand on Respondents for the immediate and full payment of all amounts due on Notes A and B. CHC admits that it is in default on Note B.[2] However, CHC denies that it owes the amounts due on Note B to FH Partners. CHC also denies that FH Partners has the right to enforce collection of Note A.[3]

On April 13, 2010, FH Partners filed a seven count petition ("Petition") against CHC and the Guarantors alleging Count I (an action on Note A against CHC), Count II (an action on Note B against CHC), Count III (an action on Note A against the Guarantors), Count IV (an action on Note B against the Guarantors), Count V (a claim for replevin and money damages against CHC), Count VI (an claim for injunctive relief against CHC), and Count VII (a request for the appointment of a receiver).

### The Competing Summary Judgment Motions

■■■ On August 16, 2011, FH Partners filed a motion for summary judgment. The Respondents filed a counter motion for summary judgment. On November 8, 2011, the trial court denied FH Partners' motion for summary judgment and granted the Respondents' counter motion for summary judgment ("Judgment"). Pertinent to this appeal, the trial court concluded as a matter of law: (i) that the FDIC/Weatherford Agreement was not retroactively effective to November 7, 2008

---

**2.** On September 27, 2008, CHC defaulted on Loan B by failing to pay the amount due on or before the Maturity Date.

**3.** It is not clear whether CHC is claimed to be in default on Loan A because it failed to make payments due on Note A or because of the cross-default provision in Note B.

because the FDIC and Weatherford had not reached complete assent about the terms of the agreement until on or after June 9, 2009 and did not have mutuality of assent as to the effective date of the agreement; (ii) that the FDIC had no transferable interest in Loan A or Loan B on December 16, 2008 (the date of the FDIC/FH Loan Sale Documents) and that FH Partners never acquired an ownership interest in either Loan as a result; (iii) that FH Partners failed to establish that it owned either of the Loans it was seeking to collect; (iv) that the Respondents negated an essential element of FH Partners' claims (ownership of Loan A and Loan B); and (v) that the FDIC/Weatherford Agreement did not negate, cure, or correct the null, void, and invalid transfers of Loan A and Loan B under the FDIC/FH Loan Sale Documents. The Judgment dismissed Counts I, II, III, IV, V, and VI of the Petition with prejudice.[4]

On November 17, 2011, FH Partners filed a motion to amend, vacate, and correct judgment and a motion for new trial which was denied after a hearing. Judgment was entered and FH Partners' petition was dismissed with prejudice.

FH Partners appeals.

## Standard of Review

" 'When considering appeals from summary judgments, [we] will review the record in the light most favorable to the party against whom judgment was entered.' " *State ex rel. Ad Trend, Inc. v. City of Platte City,* 272 S.W.3d 201, 203 (Mo.App. W.D.2008) (quoting *ITT Commercial Fin. Corp. v. Mid–Am. Marine Supply Corp.,* 854 S.W.2d 371, 376 (Mo. banc 1993)). " 'Our review is essentially *de novo.* The criteria on appeal for testing the propriety of summary judgment are no different from those which should be employed by the trial court to determine the propriety of sustaining the motion initially.' " *Id.* (citation omitted). "Summary judgment is proper when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *State ex rel. City of Desloge v. St. Francois Cnty.,* 245 S.W.3d 855, 859 (Mo.App. E.D. 2007) (citing Rule 74.04(c)(6)).

## Analysis

FH Partners raises three points on appeal. FH Partners claims that the trial court erred in granting summary judgment to CHC and the Guarantors because: (1) it was error to hold that the FDIC lacked any transferable interest in Loan B and that no ownership interest in Loan B was conveyed to FH Partners because the undisputed record shows that on December 16, 2008, the FDIC held at least an undivided 36% participation interest in Loan B and the rights as lead lender of Loan B (Point I); and (2) it was error to hold that the FDIC lacked any transferable interest in Loans A and B on Decem-

---

4. The Judgment did not address count VII, the request for the appointment of a receiver. The request for an appointment of a receiver is not an independent cause of action, but is relief necessarily ancillary to a pending claim. *State of Missouri ex rel. Chicago Cardinals Football Club v. Nangle,* 369 S.W.2d 167, 170 (Mo. banc 1963) ("[T]here is no such cause of action as the appointment of a receiver. The appointment is most generally incidental to some other right, the protection of the property pendente lite, or to enforce the judgment of

the court."). The request was thus rendered moot by the trial court's dismissal of Counts I through VI of the Petition. The Judgment's failure to technically address Count VII does not affect its finality for purposes of appeal. If a judgment implicitly resolves a pending claim, the judgment may still be a final judgment for purposes of appeal even though it makes no explicit reference to the claim. *See Short v. Southern Union,* 372 S.W.3d 520, 528–29 (Mo.App. W.D.2012).

ber 16, 2008, because the FDIC/Weatherford Agreement was retroactively effective on November 7, 2008, affording the FDIC retroactive ownership and the ability to transfer 100% of Loans A and B to FH Partners on December 16, 2008 (Point II). FH Partners also claims that the trial court erred in dismissing counts I through VI of the Petition with prejudice (Point III).

We will address FH Partners' first and second points on appeal by separately discussing FH Partners' right to pursue collection of Loan A and Loan B. We will then address FH Partners' third point on appeal as to those counts of the Petition for which we affirm the trial court's grant of summary judgment.

## I. *FH Partners' Right to Collect Loan A*

There is no factual dispute that on August 22, 2008, the date the FDIC became the receiver of Columbian, Loan A had been participated to Weatherford. Weatherford held a 94.5% participation interest in Loan A and Columbian retained a 5.5% interest in Loan A along with the right and obligation to collect the Loan as lead lender. The FDIC assumed the interest of Columbian in Loan A.

There is also no dispute that on September 10, 2008, the FDIC assigned all of its rights in Loan A to Weatherford, the effect of which was to make Weatherford the 100% owner of Loan A and the entity with the right to collect the Loan.

■ Thus, there is no dispute that on December 16, 2008, when the FDIC/FH Loan Sale Documents closed, the FDIC held no rights in Loan A to transfer to FH Partners. It is well settled that "as a matter of general property law, one who does not hold title to property . . . cannot pass or transfer title to that property." *Estate of Herbert v. Herbert*, 152 S.W.3d 340, 348 (Mo.App. W.D.2004). It follows that unless FH Partners demonstrated a genuine issue of material fact in dispute with respect to its ownership of Loan A (and thus its right to enforce Loan A), the trial court did not error in granting judgment to the Respondents as to those counts in the Petition seeking to enforce Loan A.

FH Partners argues, though the FDIC did not own any rights in Loan A on December 16, 2008, the June 10, 2009 FDIC/Weatherford Agreement retroactively remediates that defect. FH Partners argues that pursuant to the FDIC/Weatherford Agreement, the FDIC became the owner of 100% ownership of Loan A retroactive to November 7, 2008. According to FH Partners, the FDIC's retroactive ownership of Loan A necessarily requires the conclusion that FH Partners retroactively owned Loan A as of December 16, 2008. We disagree.

Two issues are presented by FH Partners' creative argument. The first is whether the FDIC/Weatherford Agreement manifested a clear and unambiguous intent to afford the agreement retroactive effect. The second is whether that intent, if found, can be presumed to have retroactive impact on the separate and distinct transaction represented by the FDIC/FH Loan Sale Documents.

### (a) *The Intent of the FDIC and Weatherford*

■ There is general authority for the proposition that a written contract becomes binding when it is finally executed or delivered, unless a different intent appears. *Cosby v. Harding*, 553 S.W.2d 535, 536 (Mo.App.1977). Here, it is undisputed that the FDIC/Weatherford Agreement was both executed and delivered on June 10, 2009. It is also undisputed that the FDIC/Weatherford Agreement expressed

an intended effective date of November 7, 2008.

■ "The primary rule in interpretation of contracts is to ascertain the intent of the parties and give effect to that intent." *Mt. Hawley Ins. Co. v. Azia Contractors, Inc.*, 886 S.W.2d 640, 642 (Mo. App. W.D.1994) (citation omitted).

> Where there is no ambiguity in a contract, the intent of the parties is to be determined from the contract alone and the courts will not resort to construction where the intent of the parties is expressed in clear and unambiguous language. Where there is ambiguity, the court must examine all relevant circumstances including the relationship of the parties, the construction placed on the contract by the parties over time, and any other facts and actions which cast light on the intention of the parties.

*Id.* (citations omitted).

■ Here, the FDIC/Weatherford Agreement provided for an effective date of November 7, 2008, and stated that "closing of the transactions contemplated by this Agreement will take place . . . on or before June 10, 2009 . . . to be effective, however, for all purposes on the Effective Date." However, Termination of Participation Agreements executed by Weatherford in connection with closing were executed "in connection with that certain [FDIC/Weatherford] Agreement dated *as of* June 10, 2009." (Emphasis added.) The Termination of Participation Agreements do not provide for a retroactive effective date. The FDIC/Weatherford Agreement and the Termination of Participation Agreements are thus in conflict with one another. This conflict is not resolved by the parties' documents as no explanation for a retroactive effective date is provided.

The trial court was thus permitted to look to the uncontested evidence of "other facts and actions which cast light on the intention of" the FDIC and Weatherford. *Id.* That uncontested evidence was captured by the trial court's relevant factual findings in the Judgment. The trial court found that the Termination of Participation Agreements signed by Weatherford were both executed and effective as of June 10, 2009. The trial court found that Weatherford did not perfect its security interests in loans it received in exchange for Loans A and B until on or after June 10, 2009. The trial court found that the cash consideration anticipated by the FDIC/Weatherford Agreement was paid by wire transfer on June 10, 2009. In effect, the trial court found that notwithstanding the stated retroactive effective date, the FDIC did not actually acquire a 100% interest in Loan A until June 10, 2009.

This finding was bolstered by the trial court's finding that emails were being exchanged between Weatherford and the FDIC reflecting continued negotiation of the terms of the FDIC/Weatherford Agreement until just before it was executed. One of these emails indicated that Weatherford was not advised until February 13, 2009, "that the Swap case has been formally approved by the FDIC authorities."[5] On June 2, 2009, Weatherford was advised in another email that "We would like to calculate the dollars that are being swapped as a result of this transaction so that we can prepare documentation. . . ." On June 9, 2009, the day before the FDIC/Weatherford Agreement was actually executed, an email was sent to both Weatherford and FDIC personnel stating, "the most recent updated version of the [L]oan Exchange Agreement [is attached] for you to review. Prior versions are ob-

---

**5.** It is undisputed that the "Swap case" is a reference to the Loan Exchange Agreement.

solete, so please review this draft agreement with your legal counsel." Based on these emails, the trial court found that the FDIC and Weatherford had not reached a binding, enforceable agreement until just shortly before they executed the FDIC/Weatherford Agreement. The trial court thus found that the absence of mutual assent to afford the FDIC/Weatherford Agreement retroactive effect to November 7, 2008.

■ The law does not support the blanket· conclusion that a retroactive effective date in a contract is only enforceable when the evidence demonstrates that the parties had agreed to the material terms of their contract as of the retroactive date. However, where a contract is ambiguous with respect to its effective date, the absence of an explanation for a retroactive effective date, and evidence that the parties had not agreed to the material terms of their contract as of the purported retroactive effective date, are relevant considerations in resolving the ambiguity. We cannot conclude, therefore, that in resolving the inconsistency between the FDIC/Weatherford Agreement and the Termination of Participation Agreements, the trial court erroneously relied on these uncontested facts to find "a lack of mutual assent" with respect to a November 7, 2008 effective date.

In many respects, the outcome here is similar to that reached in *Cosby*, where a lease and check were backdated for the tax purposes of one of the parties, but the backdated date was not demonstrated as the intended effective date with respective to rights of the parties as between themselves. 553 S.W.2d at 537. The court in *Cosby* concluded the actual execution date of the lease (and not the contract's stated

effective date) was the legal effective date of the lease. *Id.*

Though the record here does not explain why the FDIC/Weatherford Agreement provided for a retroactive effective date, if we surmise that the likely intent was to permit the FDIC to argue that it had retroactively cured its lack of an ownership interest in Loan A as of the date of the FDIC/FH Loan Sale Documents,[6] then we are faced with a situation similar to that in *Cosby*. The unilateral advantage the FDIC hoped to gain from a retroactive effective date was not central to the transaction between the FDIC and Weatherford, and was not demonstrated to control for all purposes the relationship of the parties to the FDIC/Weatherford Agreement.

### (b) The Effect of Retroactivity on the FDIC/FH Loan Sale Documents

■ More to the point, even if we assume that the FDIC/Weatherford Agreement unambiguously expressed the intent to be retroactively effective as of November 7, 2008, we must still assess the legal effect of retroactivity on the completely separate and already performed FDIC/FH Loan Sale Documents. FH Partners suggests that it was an intended beneficiary of the retroactive effective date included in the FDIC/Weatherford Agreement, and that, as a result, it should be treated as having acquired a 100% interest in Loan A as of December 16, 2008. We disagree.

Only those third parties for whose primary benefit the contracting parties intended to make the contract may [enforce] the contract. The intent of the contracting parties is of paramount im-

---

**6.** Counsel for FH Partners admitted during oral argument that this was the likely intent of the retroactive effective date.

portance to such an analysis.... The party need not be named in the contract, but the terms of the contract must clearly express an intent to benefit either that party or an identifiable class of which plaintiff is a member.

*Mitchell v. K.C. Stadium Concessions, Inc.*, 865 S.W.2d 779, 786 (Mo.App. W.D. 1993) (internal citations omitted). Here, it is undisputed that the terms of the FDIC/Weatherford Agreement did not "clearly express an intent to benefit" FH Partners or "any identifiable class of which [FH Partners] is a member." *Id.*

FH Partners also argues that regardless whether it was a third party beneficiary, the retroactive effectiveness of the FDIC/Weatherford Agreement necessarily bestowed on FH Partners a 100% ownership interest in Loan A as of the date of the FDIC/FH Loan Sale Documents. FH Partners argues that because the FDIC acquired Loan A retroactively, it must follow that the FDIC's ineffective transfer of Loan A pursuant to the FDIC/FH Loan Sale Documents was cured.

█ FH Partners does not cite a single authority for the proposition that a retroactive effective date in one contract can be construed to have an automatic retroactive effect on a separate contract. " 'When an appellant cites no authority and offers no explanation why precedent is unavailable, appellate courts consider the [argument] waived or abandoned.' " *Williams v. Belgrade State Bank*, 953 S.W.2d 187, 190 (Mo.App. S.D.1997) (citation omitted); Rule 84.13(a) ("[A]llegations of error not briefed ... shall not be considered in any civil appeal."). Though FH Partners cites to several cases for the general proposition that the parties to a contract can agree to give a contract retroactive effect, none of those cases address or support the proposition that a retroactive effective date in one contract will be applied to retroactively modify or reform a separate contract involving at least one unrelated party.

Moreover, FH Partners' argument ignores that summarily applying the retroactive effective date from the FDIC/Weatherford Agreement to the FDIC/FH Loan Sale Documents would be inconsistent with the express terms of the FDIC/FH Loan Sale Documents. The Loan Sale Agreement between the FDIC and FH Partners expressly provides that "[n]o provision of this Agreement may be amended or waived except in writing executed by all of the parties to this Agreement." *See* paragraph 10.6. In addition, the FDIC/FH Loan Sale Documents did not anticipate that the FDIC could modify what it was conveying to FH Partners after closing. To the contrary, the Loan Sale Agreement expressed the intent to convey "all of the right, title and interest of [the FDIC]" in Loan A and Loan B *"as of the Loan Sale Closing Date." See* paragraph 2.4 (emphasis added). The trial court thus correctly found in its Judgment that the Loan Sale Agreement between the FDIC and FH Partners "expressly limited the rights and interests transferred by the FDIC to those possessed by the FDIC as of December 16, 2008."

In addition, the Loan Sale Agreement provided that the FDIC was selling Loan A and Loan B to FH Partners "as is" and "without any representation, warranty or recourse whatsoever." *See* paragraph 6.1. The Loan Sale Agreement provided that the FDIC would "have no obligation to secure or obtain any missing intervening assignment or any assignment to [the FDIC] that is not contained in the Loan File." *See* paragraph 6.7. Critically, the Loan Sale Agreement set forth a detailed process by which FH Partners could require the FDIC to repurchase a Loan if it was determined after closing that "prior to the Loan Sale Closing Date" ... *Seller*

*[was] not the owner of the Loan.*" *See* paragraph 7.1 (emphasis added). Finally, the Loan Sale Agreement required the execution and delivery at closing of a Bill of Sale and an Assignment and Assumption of Interests and Obligations, both of which expressed the transfer of rights held by the FDIC *at the time of closing,* and both of which indicated that all transfers were without warranty or recourse.

We necessarily conclude that the FDIC/FH Loan Sale Documents unambiguously anticipated that the FDIC might very well be conveying to FH Partners less than perfect, and even non-existent, title to Loan A and Loan B. In light of that fact, there is no evidence that the FDIC was authorized to unilaterally cure title defects months after closing.

We cannot conclude that the retroactive effective date in the FDIC/Weatherford Agreement had the automatic effect of retroactively modifying the rights and interests on the FDIC and FH Partners under the FDIC/FH Loan Sale Documents. The FDIC/Weatherford Agreement, even if effective to afford the FDIC ownership of Loan A as of November 7, 2008, was not effective to retroactively bestow ownership of Loan A upon FH Partners as of December 16, 2008.

The trial court correctly concluded that FH Partners never acquired an ownership interest in Loan A, and thus had no right to collect Loan A from the Respondents. The uncontested facts supported the trial court's entry of summary judgment in favor of the Respondents as to those counts in the Petition seeking recovery on Loan A (Counts I and III), and as to those counts in the Petition seeking replevin and an injunction (Counts V and VI) insofar as they sought relief involving Loan A.

## II. FH Partners' Right to Collect Loan B

In discussing Loan A, we have already considered and rejected FH Partners' argument that the alleged retroactive effect of the FDIC/Weatherford Agreement operated to afford FH Partners with a 100% ownership interest in the Loans transferred by the FDIC/FH Loan Sale Documents. We need not explore that analysis again, other than to point out that it is of equal application to Loan B. FH Partners did not have a 100% ownership in Loan B as a result of the closing of the FDIC/FH Loan Sale Documents. FH Partners has alternatively argued that the FDIC transferred to it a 36% ownership interest and the rights as lead lender in Loan B by virtue of the FDIC/FH Loan Sale Documents.

 There is no dispute that as of closing on the FDIC/FH Loan Sale Documents on December 16, 2008, Loan B was subject to the Participation Agreement which afforded Weatherford a 64% "participation percentage" in Loan B. "Participation Percentage" is defined in the Participation Agreement as "[t]he Participant's *percentage of ownership*[7]

---

**7.** We highlight this phrase because although not raised in its brief, at oral argument FH Partners took the position that a participation agreement does not convey an "ownership" interest, but merely a right to share in the proceeds of collection on a note. FH Partners thus urged in oral argument that the FDIC actually owned 100% of Loan B at the time of the FDIC/FH Loan Sale Documents, subject to Weatherford's right to share in the proceeds of collection of the Loan. FH Partners cited *Sunflower Bank, N.A. v. Federal Deposit Insurance Corporation,* No. 09–4006–SAC, 2010 WL 3913597, at \*7 (D.Kan. September 30, 2010) for this proposition. Though that case does state that a participant on a loan is not an "owner" of the loan, that discussion is in the context of recognizing that as between the participant and the borrower, there is no privity of contract permit-

... in the Loan as of the Date of the Participation."

Columbian was identified as the "Originating Bank" in the Participation Agreement. As the Originating Bank, Columbian was the "lead lender," obligated to administer and enforce Loan B, and to account to Weatherford for amounts paid on Loan B. Any expenses of collection incurred by Columbian as the Originating Bank were to be ratably born by Weatherford.

It is thus uncontested that on December 16, 2008, the FDIC held a 36% ownership interest in Loan B and Weatherford held a 64% ownership interest in Loan B. It is also uncontested that as of December 16, 2008, the FDIC was the "lead lender" for Loan B, and thus was the only entity as between it and Weatherford with the right and the obligation to collect Loan B from the Respondents.

Despite these uncontested facts, the Judgment concluded that the FDIC had *no* transferable interest in Loan B on December 16, 2008. The Judgment also concluded that as a result, FH Partners never acquired an ownership interest in Loan B. Both of these legal conclusions are erroneous. We address them separately.

*(a) The FDIC's transferable interest in Loan B*

It is a bedrock principle of American jurisprudence that in the absence of a lawful bar to the right to do so, the owner of property has the unlimited power to alienate that property. *See, e.g., Lastofka v. Lastofka,* 339 Mo. 770, 99 S.W.2d 46, 58 (1936). The Judgment does not clearly identify a lawful impediment to the FDIC's ability to transfer the undisputed interests it held in Loan B on December 16, 2008. We turn to the record to determine whether such an impediment existed.

Although the Participation Agreement prohibited Weatherford from selling its participation interest in Loan B without first securing Columbian's consent, the Participation Agreement did not similarly prohibit Columbian (and thus the FDIC) from assigning or selling its interest in Loan B. Thus, the Participation Agreement for Loan B did not lawfully restrain the FDIC from the right to transfer its 36% ownership interest and its lead lender rights in Loan B.

The Judgment concluded (as it also did with respect to Loan A) that the FDIC/Weatherford Agreement did not retroactively negate, cure, or correct the null, void, and invalid transfer of Loan B under the FDIC/FH Loan Sale Documents. However, in contrast to Loan A (where the FDIC held no interest on December 16, 2008), the FDIC did own a 36% ownership

ting the participant to seek to enforce the loan. *Id.* at *9. We simply do not agree that as between the initial lender and a participant, the participant is not considered an "owner" of the percentage of the participated loan acquired, particularly where, as here, the participation agreement defines the participation percentage as an "ownership interest." In fact, in *Sunflower,* the District Court of Kansas cited with approval cases generally discussing the contractual import of a participation agreement, acknowledging that such agreements permit a bank to lend in excess of its lending limits by dividing a loan into

shares, then *selling* shares of the loan to participating banks. *Id.* at *1.

In any event, the argument that Columbian (and thus the FDIC) always remained the 100% owner of Loan B notwithstanding the Participation Agreement with Weatherford was not advanced before the trial court or in FH Partners' brief, and was first advanced during oral argument. The argument is not preserved for our review. *See, e.g., Turpin v. King,* 693 S.W.2d 895, 896 (Mo.App. S.D. 1985) (holding that argument not raised with the trial court and first raised on appeal is not preserved for appellate review).

interest and the rights as lead lender in Loan B on December 16, 2008. The trial court's finding that the FDIC/Weatherford Agreement did not retroactively cure the FDIC's title defects with respect to Loan B would support the conclusion that the FDIC did not transfer a 100% ownership interest in Loan B to FH Partners on December 16, 2008. However, the trial court's finding does not support the conclusion that the FDIC had *no* transferable interest in Loan B on December 16, 2008.

■■■■■ The Respondents argued in their motion for summary judgment that the FDIC was barred from transferring its interests in Loan B by 12 C.F.R. section 360.6(b). However, the trial court did not rely on this regulation to conclude that the FDIC had no transferable interest in Loan B as of December 16, 2008. The Judgment found that "[b]ecause the Court's conclusions regarding the issues described in detail above are dispositive, the Court need not, and does not, address [this regulation]." We are nonetheless obliged to sustain the trial court's entry of summary judgment on this ground if appropriate. "If, as a matter of law, summary judgment is sustainable on any theory, even one entirely different from that addressed by the trial court, it should be sustained on appeal." *School District of Kansas City v. Missouri Board of Fund Commissioners,* — S.W.3d ——, ——, 2012 WL 3568265 (Mo.App. W.D.2012).

We reject the Respondent's argument that 12 C.F.R. section 360.6(b) prohibited the FDIC from transferring its rights in Loan B to FH Partners. At the time of the FDIC/FH Loan Sale Documents, that section provided:

> The FDIC shall not, by exercise of its authority to disaffirm or repudiate contracts under 12 U.S.C. 1821(e), reclaim, recover, or recharacterize as property of the institution or the receivership any financial assets transferred by an insured depository institution in connection with a ... participation, provided that such transaction meets all conditions for sale accounting treatment under generally accepted principles....

The plain language of this regulation prohibits the FDIC from reclaiming as property of a failed bank a participated interest in a loan for which adequate consideration has been paid. The FDIC/FH Loan Sale Documents did not attempt to reclaim the Loan B participation interest from Weatherford. To the contrary, the FDIC/FH Loan Sale Documents made no mention whatsoever of the participation interest held by Weatherford in Loan B. Rather, the FDIC/FH Loan Sale Documents anticipated that loans being transferred may well be subject to participation interests. The term "Note" is defined in the Loan Sale Agreement to mean "each agreement, document and instrument evidencing a Loan, including, without limitation ... participation agreement[s]." The term "Participated Loan" is defined in the Loan Sale Agreement as "any Loan subject to a shared credit, participation or similar inter-creditor agreement under which [Columbian] was lead or agent financial depository institution or otherwise managed the credit or sold participations...." FH Partners agreed in the Loan Sale Agreement "to assume all of the Obligations of [Columbian] or [the FDIC] under ... the Notes," which, as we have observed, is a term defined to include participation agreements. *See* paragraph 2.1. FH Partners agreed in the Loan Sale Agreement that "[f]rom and after the Loan Sale Closing Date, all rights, obligations, liabilities and responsibilities with respect to the servicing of the Loans shall pass to [FH Partners]...." *See* paragraph 3.3.

As we have already observed in our discussion of Loan A, the FDIC/FH Loan

Sale Documents conveyed Loan B "as is," without warranty, representation or recourse. The FDIC/FH Loan Sale Documents did not represent the extent of the FDIC's claimed interest in Loan B. Rather, the FDIC/FH Loan Sale Documents simply conveyed whatever interest in Loan B, if any, the FDIC possessed. 12 C.F.R. section 360.6(b) did not prohibit the FDIC from transferring the rights it actually owns in Loan B to FH Partners merely because Loan B was subject to a participation agreement. In fact, courts have repeatedly held that the FDIC is not precluded from transferring participated loans. *See Mile High Banks v. F.D.I.C.,* No. 11–CV–01417–WJM–MJW, 2011 WL 2174004 (D.Colo. June 2, 2011) (sale of participated loan falls plainly within the FDIC's statutory powers as a receiver); *City and Suburban Management Corp. v. First Bank of Richmond,* 959 F.Supp. 660, 668 (D.Del.1997) ("The FDIC ha[s] the power to transfer … all of the rights and liabilities contained in the Participation Agreements."); *Sunflower Bank, N.A.,* No. 09–4006–SAC, 2010 WL 3913597, at \*7 ("As receiver, the FDIC may transfer any asset or liability of the institutions.").

We are unable to locate any basis on which the trial court's conclusion that the FDIC had no transferable interest in Loan B on December 16, 2008 can be sustained. Rather, we find that on December 16, 2008, the FDIC held a 36% ownership interest and the rights as the Originating Bank in Loan B. Thus, on December 16, 2008, the FDIC held the exclusive right to enforce Loan B, subject to its contractual obligation under the Participation Agreement with Weatherford to account for and share the collected proceeds of the Loan.

*(b) The Interest Acquired by FH Partners in Loan B*

The trial court concluded that FH Partners "never acquired an ownership inter-

est in" Loan B. The trial court reached this conclusion "[b]ecause the FDIC lacked a transferable interest" in Loan B as of December 16, 2008. Because we have determined the latter conclusion to be erroneous as a matter of law, the corollary conclusion that FH Partners acquired no ownership rights in Loan B is equally erroneous.

Again, however, we are bound to sustain the trial court's Judgment on any available theory. *School District of Kansas City,* —— S.W.3d at ——.

The Judgment found that the FDIC did not "unequivocally part with the power of control over Loan B" as evidenced by the FDIC's negotiation of the FDIC/Weatherford Agreement after it had purported to transfer its rights in Loan B to FH Partners. The Judgment then held that the FDIC's retention of control over Loan B was "fatal to [FH Partners'] claim" that 100% ownership positions in Loans A and B were *equitably* assigned to it as of December 16, 2008. FH Partners has abandoned the claim it asserted to the trial court that the FDIC/FH Loan Sale Documents, if not effective to actual assign rights, at a minimum equitably assigned rights in Loan A and Loan B to FH Partners. The trial court held that the FDIC's subsequent negotiations with Weatherford were inconsistent as a matter of law with a theory that Loan B had been equitably assigned to FH Partners. *State ex rel. United Industries Corp. v. Mummert,* 878 S.W.2d 494, 497 (Mo.App. E.D.1994). This legal conclusion has no relevance, however, to defeating FH Partners' claim that the FDIC/FH Loan Sale Documents were legally effective to *actually* assign a 36% ownership and lead lender interest in Loan B.

 The Respondents argued in their motion for summary judgment that the

FDIC's transfer of Loan B to FH Partners was ineffective because the Transfer Documents were not signed by a lawfully authorized representative of the FDIC. The trial court did make the factual finding that "[t]he assertion that [Butler] had authority to execute documents that effectuated a transfer of the loans on December 16, 2008, would be a nullity in that the limited power of attorney granted to [Butler] was effective on December 17, 2008, through December 31, 2009." However, the trial court did not rely on this finding to conclude that FH Partners did not acquire an interest in Loan B. Rather, as it did with the Respondents' argument about the effect of 12 C.F.R. section 360.6, the trial court expressly held that it need not reach the issue concerning "the authority granted to [FH Partners'] personnel to execute documents on behalf of the FDIC" because it had otherwise concluded that FH Partners had no right to collect Loan B from the Respondents. We nonetheless examine whether the suspect execution of the Transfer Documents could permit us to sustain the trial court's conclusion that FH Partners never acquired an interest in Loan B.

We have already explained that the Transfer Documents were defined by the Loan Sale Agreement to exclude the FDIC/FH Loan Sale Documents. And we have explained that the Transfer Documents were defined as documents, if any, "required under the laws of any jurisdiction within the United States to *evidence* the transfer to [FH Partners] of [Loan A and Loan B]." (Emphasis added.)

The commonly understood meaning of the word "evidence" as used in this context is "something indicative, an outward sign." THE AMERICAN HERITAGE DICTIONARY 476 (3rd ed.1993). The Transfer

Documents were not envisioned to be the documents which would actually transfer the FDIC's interest in Loan B to FH Partners. Rather, the Transfer Documents were envisioned to be permissible evidence that the transfer had, in fact, occurred to the extent required to satisfy the laws of a particular jurisdiction.

The language in the FDIC/FH Loan Documents underscores this conclusion. The Loan Sale Agreement provides that the "sale, assignment, transfer and conveyance by [the FDIC] and the purchase, acceptance and assumption by [FH Partners] [of Loan A and Loan B] *shall occur at and as of the Loan Sale Closing Date.*" See paragraph 2.1 (emphasis added). "Closing" is defined in the Loan Sale Agreement as "the simultaneous delivery by [the FDIC] and [FH Partners] of documents and funds and the performance of the other acts herein provided to be performed on the Loan Sale Closing Date *in order to effect the consummation of the Loan Sale.*" (Emphasis added.) "Loan Sale" is defined as "the sale of [Loan A and Loan B]." These provisions reflect the clear and unambiguous intention to *effect* the actual transfer of the FDIC's rights and interests in Loan A and Loan B to FH Partners at closing on December 16, 2008.

In further evidence of this intent, the Loan Sale Agreement describes the documents that were required to be delivered at closing. See paragraph 3.1(a)(b). These required closing documents including an Assignment and Assumption of Interests and Obligations and a Bill of Sale. The Assignment and Assumption of Interests and Obligations and the Bill of Sale include language reflecting a contemporaneous and actual transfer of the FDIC's rights and interests in the Loans as of closing.[8] In contrast, the Transfer Docu-

8. Unlike the Transfer Documents, the FDIC/FH Loan Sale Documents were signed

ments were not required closing documents, but *could* be delivered by the FDIC at closing at the FDIC's election. *See* paragraph 3.1(b)(4). Alternatively, the Loan Sale Agreement provided that Transfer Documents *could* be prepared by FH Partners *after closing* if necessary to address local law requirements. *See* paragraph 3.1(e).

We conclude that the suspect execution of the Transfer Documents by Butler [9] did not negate the legal effect of the FDIC/FH Loan Sale Documents to transfer the FDIC's interests in Loan B to FH Partners. The Transfer Documents did not effect that transfer, but were intended merely as additional evidence of that transfer.[10]

We are unable to locate any basis on which the trial court's conclusion that the FH Partners acquired no rights in Loan B on December 16, 2008 can be sustained. Rather, we find that FH Partners acquired the rights held by the FDIC in Loan B on December 16, 2008—a 36% ownership interest and the rights as the "Originating Bank" (or lead lender) under the Participation Agreement with Weatherford. FH Partners had the right to pursue collection of Loan B from the Respondents, both on its own behalf and subject to any obligation it may have to separately account to the person or entity who now holds Weatherford's participation interest in Loan B.[11] The trial court erroneously concluded that FH Partners did not acquire an interest in Loan B on December 16, 2008. The trial court thus erroneously entered summary judgment in favor of the Respondents with respect to those counts in the Petition seeking recovery on Loan B (Counts II and IV), and with respect to those counts seeking replevin and an injunction (Counts V and VI) insofar as the relief sought in those counts involved Loan B.

On appeal, FH Partners has not challenged the trial court's denial of its motion for summary judgment as to those counts in its Petition seeking to collect and/or enforce Loan B.[12] We, therefore, remand

---

by Kathy McNair on behalf of FH Partners and by Wade Massey on behalf of the FDIC. The due execution of the FDIC/FH Loan Sale Documents was not contested in the Respondents' motion for summary judgment.

9. We use the term "suspect" because the record does not reveal when the Transfer Documents were actually executed by Butler. The Transfer Documents bear an effective date, but not an execution date. As we have already observed, a document can have an effective date that predates its execution date. We have not been pointed to any authority which would have prevented Butler from relying on the limited power of attorney to execute the Transfer Documents on or after December 17, 2008, while giving them an earlier effective date.

10. The Respondents did not argue in their motion for summary judgment that even if the FDIC/FH Loan Sale Documents were legally effective to transfer the FDIC's interests in Loan B to FH Partners, due execution of the Transfer Documents was a separate condition

to FH Partners' right to collect Loan B under Missouri law. We express no opinion on this subject.

11. We need not address who owns Weatherford's 64% participation interest in Loan B following the FDIC/Weatherford Agreement. FH Partners' obligation to account to that person or entity for amounts collected from the Respondents on Loan B has no legal bearing on FH Partners' exclusive right as the Originating Bank to seek collection of the entire balance due on Note B from the Respondents. *See First Bank of Wakeeney v. Peoples State Bank*, 12 Kan.App.2d 788, 758 P.2d 236, 239 (1988) (citing *In re Yale Express System, Inc.*, 245 F.Supp. 790, 792 (S.D.N.Y. 1965)); *Carondelet S. & L. Ass'n v. Citizens S. & L. Ass'n*, 604 F.2d 464, 469 (7th Cir.1979).

12. "Generally, the denial of a summary judgment is not a final order and, therefore, is not appealable." *Estate of Downs v. Bugg*, 242 S.W.3d 729, 732 (Mo.App. W.D.2007). However, if the denial of a motion for summary

this matter to the trial court for further proceedings consistent with this Opinion with respect to FH Partners' efforts to collect on Loan B.

## III. The Dismissal of Counts With Prejudice (Point III)

For its third point, FH Partners claims that the trial court erred in dismissing counts I through VI *with prejudice* because the alleged defect in the transfer of ownership interests in Loans A and B does not justify a dismissal with prejudice in that FH Partners is the only party that has and can assert an interest in the loans and any defect in the assignment of ownership interests can be corrected by the FDIC and FH Partners.

Discussion of this point as it relates to Loan B has been rendered moot by our conclusion that the trial court erred in entering summary judgment in favor of the Respondents as to those counts in the Petition seeking to recover on Loan B.

With respect to the counts in the Petition seeking to recover on Loan A, we find FH Partners' claim of error to be without merit.

 Though the Judgment purported to "dismiss with prejudice" the counts seeking in whole or in part to collect Loan A, in reality the Judgment disposed of competing motions for summary judgment by entering a judgment in favor of the Respondents on those counts. "[A] summary judgment is not a "dismissal" as contemplated by Rule 67.03, which applies to dismissals that the circuit court may grant without prejudice to refiling. As opposed to the dismissal contemplated by Rule 67.03, summary judgments *always* dispose of the merits of the case." *State ex rel. City of Blue Springs, Missouri v. Schieber*, 343 S.W.3d 686, 690 (Mo.App. W.D.2011) (emphasis added) (citing *St. Louis Univ. v. Hesselberg Drug Co.*, 35 S.W.3d 451, 455 (Mo.App. E.D.2000)) ("[C]ourts have held that a summary judgment is a determination on the merits for collateral estoppel purposes."); *Williams v. Rape*, 990 S.W.2d 55, 56 (Mo.App. W.D. 1999) ("Since summary judgment is a determination on the merits, *res judicata* principles do apply to bar [the plaintiffs'] claims."); *Meyer v. Enoch*, 807 S.W.2d 156, 159 (Mo.App. E.D.1991) (holding that a summary judgment is a determination on the merits for *res judicata* and collateral estoppel purposes); Restatement (Second) of Judgments, section 19 (1982) (comment g). "For the purposes of *res judicata*, 'on the merits' means the opposite of 'without prejudice.'" *See Bugg v. Rutter*, 330 S.W.3d 148 (Mo.App. W.D.2010). "Thus, the [ ] contention that ... [a] judgment was a "summary judgment of dismissal without prejudice" is meritless: there is simply no such thing." *Schieber*, 343 S.W.3d at 690.

Point Three is denied.[13]

## Conclusion

We affirm the trial court's grant of summary judgment in favor of the Respon-

judgment is completely intertwined with a grant of summary judgment, the denial may be reviewed on appeal. *Dhyne v. State Farm Fire & Cas. Co.*, 188 S.W.3d 454, 456 n. 1 (Mo. banc 2006).

**13.** The counts seeking to collect Loan A and on which Judgment has been entered in favor of the Respondents relied on the effectiveness of the FDIC/FH Loan Sale Documents to transfer an interest in Loan A to FH Partners either actually, or by virtue of the retroactive effect of the FDIC/Weatherford Agreement. We express no opinion about the issue or claim preclusive effect of the Judgment should FH Partners later claim that it has acquired the right to enforce Loan A through a subsequent avenue or agreement.

dents on Counts I and III of the Petition, and on Counts V and VI of the Petition insofar as those counts seek relief relating to Loan A. We reverse the trial court's grant of summary judgment in favor of the Respondents on Counts II and IV of the Petition, and on Counts V and VI of the Petition insofar as those counts seek relief relating to Loan B. We remand this matter to the trial court for further proceedings consistent with this Opinion.[14]

All concur.

---

14. On August 7, 2012, FH Partners filed a motion for attorney's fees premised on its right to recover attorneys' fees incurred in collecting Loan A and Loan B as provided for in Note A and Note B. We took the motion with the case. The motion is denied without prejudice with respect to Loan A, as we have determined that FH Partners does not presently possess a right to collect Loan A from the Respondents.

The motion is denied without prejudice with respect to Loan B, as we have not been asked to determine whether FH Partners is entitled to the entry of summary judgment in its favor as to those counts seeking collection of Note B. Because we are remanding this matter, as noted, for further proceedings consistent with this Opinion in connection with the efforts to collect Loan B, FH Partners remains free to seek the recovery of attorney's fees incurred at trial and on appeal from the trial court should it otherwise prevail on the merits.